UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IMS HEALTH INCORPORATED,<br><br>        Plaintiff,<br><br>   v.<br><br>EUGENE FIEVITZ AND JASON<br>SCHLESINGER,<br><br>        Defendants. | Civil Action No. _____ |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

### NATURE OF THE ACTION

IMS Health Incorporated ("IMS," "Plaintiff" or "Company"), by and through its undersigned counsel, hereby brings the following Complaint against Defendants Eugene Fievitz ("Fievitz") and Jason Schlesinger ("Schlesinger") (collectively, "Defendants") seeking injunctive relief and damages.

### PRELIMINARY STATEMENT

1.     IMS has initiated this action to prevent Fievitz and Schlesinger, IMS employees with detailed knowledge of some of the Company's most valuable data processes, models, analytics, and relationships, from causing it irreparable harm by violating their binding restrictive covenants and potentially performing services for a direct competitor of IMS. As a condition of their employment and in consideration for eligibility in incentive compensation and equity plans, Fievitz and Schlesinger separately entered into agreements with IMS that preclude them from competing against IMS for a one-year period following their separation. In these agreements, Fievitz and Schlesinger acknowledged that they were and would be exposed to IMS's trade secrets and confidential information in the course of their performance of job duties,

and that they were prohibited from disclosing or relying upon this information for any purpose other than the benefit of IMS.  These reasonable and limited restrictions provided assurances to IMS that its trade secrets and confidential information would only be used for legitimate purposes, and that Fievitz and Schlesinger (and any subsequent employer) would not be able to benefit from them.

2.     On August 5, 2013, Fievitz and Schlesinger resigned their employment with IMS.  Upon information and belief, Defendants resigned their employment in order to accept employment with Symphony Health Solutions Corporation or a related company ("Symphony").  Symphony is a direct competitor of IMS.  Upon information and belief, Defendants' job duties for Symphony would necessarily, if not inevitably, compete with the functions they were performing for IMS and necessarily, or inevitably, rely upon the trade secrets and confidential information which IMS entrusted in them as employees.  IMS, however, has not been able to confirm Defendants' future employment plans because, when directly asked, both Fievitz and Schlesinger were evasive and refused to identify their new employer. Defendants' refusal, particularly in light of their contractual agreements, demonstrates both their intent to flout the terms of the agreements they signed and their unwillingness to cooperate with IMS to ensure that its trade secrets and confidential information are protected.

3.     IMS's need for immediate and effective injunctive relief is particularly compelling in light of the job duties Defendants performed for the Company.  Over the course of their employment at IMS, Fievitz and Schlesinger were exposed to and had deep knowledge of IMS's trade secrets and confidential information.

4.     IMS provides comprehensive data and evidence-based analysis for customers in various healthcare industries.  Defendants' job duties focused on the acquisition of

the data that is the cornerstone of IMS's business and the electronic architecture for processing and storing that data.  This means that Defendants have detailed knowledge of the quality of the data provided by suppliers, the platforms and processes created by IMS to acquire and standardize data sets, and some of the analytic techniques used by IMS to provide valuable analysis to its customers.

5.      Specifically, by way of just one example, Defendants have detailed knowledge of the design of IMS's core data models which provide the foundation for IMS's ability to adapt data into a standardized format.  Also, Defendants have detailed knowledge of IMS's de-identification and patient linking of received data, which allows IMS to use anonymous protected health information without potentially imposing on patient privacy.  If individuals or a company competing with IMS knew IMS's information, techniques, and processes in this area, they would be able to benefit from that knowledge by circumventing the work and investment in the creation of these databases and technologies.

6.      IMS's need for immediate and effective injunctive relief is a direct result of Defendants' actions.  Defendants' blanket refusal to identify their future employer is evidence that they have something to hide.  IMS thus brings this action to prevent Defendants from causing irreparable harm to the Company by flouting their contractual and common law obligations by performing work for a competitor that would allow the competitor to unfairly compete against the Company.

**JURISDICTION AND VENUE**

7.      Jurisdiction is proper due to the express consent of Fievitz and Schlesinger, pursuant to the terms of section 8.4 of Fievitz's executed Proprietary Information and Restrictive Covenant Agreement, dated April 14, 2004 ( the "2004 Restrictive Covenant

Agreement" or the "2004 Agreement") , attached hereto as Ex. A; section 8.4 of Fievitz's executed Proprietary Information and Restrictive Covenant Agreement, dated June 14, 2010 (the "2010 Restrictive Covenant Agreement" or the "2010 Agreement") attached hereto as Ex. B; and section 8.4 of Schlesinger's executed Proprietary Information and Restrictive Covenant Agreement, dated November 13, 2006, attached hereto as Ex. C ( the "2006 Restrictive Covenant Agreement" or the "2006 Agreement") (collectively, the "Restrictive Covenant Agreements" or the "Agreements").

8.     Venue is proper in the District Court pursuant to 28 U.S.C. §1391(a) and the terms of Section 8.4 of Defendants' respective Agreements.

9.     The District Court has subject matter jurisdiction over all counts pursuant to 28 U.S.C. §1332 since the amount in controversy in the present action exceeds the sum or value of seventy five thousand dollars ($75,000.00), exclusive of interests and costs, and there exists complete diversity of citizenship, as Plaintiff is a citizen of Delaware and Connecticut, Fievitz is a citizen of Pennsylvania, and Schlesinger is a citizen of Pennsylvania.

## THE PARTIES

10.     Plaintiff IMS Health Incorporated is a Delaware corporation with its principal place of business at 83 Wooster Heights Road, Danbury, Connecticut  06810.

11.     Defendant Eugene Fievitz is an individual and a citizen of the Commonwealth of Pennsylvania, residing at 2100 Wynne Way, Jamison, Pennsylvania 18929.

12.     Defendant Jason Schlesinger is an individual and a citizen of the Commonwealth of Pennsylvania, residing at 250 Iven Avenue 2B, St. Davids, Pennsylvania 19087.

## FACTUAL ALLEGATIONS

**A.**    **IMS's Business and Its Reliance on Trade Secrets and Confidential Information to Drive Its Success**

13.    IMS is a leading information, services, and technology company dedicated to making healthcare perform better. IMS helps clients improve patient outcomes and operate more efficiently by providing clients with real-world evidence, advanced analytics, and proprietary software platforms. IMS's customers include, but are not limited to, pharmaceutical, medical device and consumer health manufacturers and distributors, providers, payers, government agencies, policymakers, researchers, and the financial community. IMS partners with its customers to provide evidentiary-based data to help generate improved customer outcomes. IMS markets its products throughout the United States and internationally.

14.    As described in greater detail below, there are several general categories that constitute IMS's trade secrets and information as relevant to this action.

15.    The first relevant category of IMS's trade secrets and confidential information consists of the actual data that is acquired for the Company's database warehouses, as well as use restrictions negotiated by the data suppliers in confidence. IMS collects data from data suppliers ranging from software suppliers to individual medical clinics. In this business, it is important to have expertise in the format in which data suppliers store their data so that the data can be effectively and efficiently transferred to IMS's data warehouse. It is also important to have knowledge of the use restrictions imposed by suppliers because those restrictions dictate how the data acquired can be used by IMS and its customers. IMS has invested in developing expertise in understanding how data is stored by suppliers across a diverse array of platforms and formats, and through experience how data suppliers permit their data to be used.

16.    The second relevant category of IMS's trade secrets and confidential information includes the acquisition process for transferring the data from the supplier to IMS's

data warehouses.  Some of the data acquired by IMS does not come in a standardized format.

Instead, particularly with some suppliers of Electronic Medical Records ("EMR"), which is a

fast-growing area of healthcare data, some data suppliers house their data in different platforms

with varying degrees of knowledge regarding their data storage.  Therefore, IMS has had to

invest time and resources to develop tools and techniques for assessing a supplier's data.  IMS

has also had to develop acquisition architecture so that the supplier data can be effectively

transferred from the vendor to the Company in a format that can be integrated and incorporated,

including scrubbing the data of Protected Health Information ("PHI") and linking it to data

already housed by IMS as appropriate.  This acquisition process is central to the business success

of IMS and its competitors, and the processes and technologies used to effectuate these transfers

are trade secrets and confidential information.

     17.    The third category of relevant trade secrets and confidential information

consists of the storage of the data in a format where it can be readily manipulated for analytical

purposes.  Because of the data's size, in order for IMS to provide meaningful service to its

customers, it must have an effective platform on which to house and analyze the data.  IMS has

developed these platforms through innovation and investment.

     18.    IMS's trade secrets and confidential information, of course, are not limited

to the three above categories.  By way of example, select IMS personnel are regularly engaged in

strategic planning across various markets and platforms to assess customers' future needs and

best position IMS to meet those needs both in the United States and worldwide.  IMS's strategic

planning is not known publicly or even within the Company outside of the employees

participating in the strategic initiatives.

19.     Upon information and belief, IMS's data architecture, data acquisition processes, and data analysis processes, all provide value both to the Company and its customers by allowing IMS to provide valuable evidence-based analysis across the healthcare industry.

20.     IMS recognizes the value of its trade secrets and confidential information and takes steps to protect access to such information.

21.     IMS has in place policies, including a business conduct policy, that require employees to keep its business information confidential and prohibit employees from using its information for any purpose other than the benefit of IMS.  These policies are available on the Company intranet to which all IMS employees have access.

22.     IMS also requires employees to acknowledge their confidentiality obligations and requires that certain key employees, including Defendants, enter into restrictive covenants preventing them from competing with the Company for a limited time so that IMS's competition does not receive the benefit of its trade secrets and confidential information.

23.     IMS also physically restricts access to its facilities both for third-parties and for its employees.  IMS facilities are not generally open to the public, including contractors.  Access to IMS facilities are controlled through a card-swipe system and/or through a receptionist.  Third-parties are only allowed access to the section of the IMS facility related to their legitimate business.  IMS employees also do not have unfettered access to all IMS facilities but are generally restricted to the facility in which they work, unless there is a legitimate business reason for broader access.  IMS also restricts access to its on-line systems and information technology to Company employees on an as-needed basis.

24.     In sum, IMS recognizes the importance of its trade secrets and confidential information and takes appropriate steps to protect them.

**B.      Defendants' Enter Into Restrictive Covenant Agreements With IMS to Protect the Company's Trade Secrets and Confidential Information**

        25.      Fievitz was hired by the Company on or about April 2004.  Throughout his employment at IMS, Fievitz has worked in positions in which he has been entrusted with its confidential information and trade secrets.  Fievitz currently holds the position of Senior Manager, Enterprise Data Assessment, Analysis & Integration in IMS's Global Technology Services & Operations Department.  In this position, until his resignation, Fievitz had supervisory authority over another employee.  Fievitz's job duties included taking a lead role in the acquisition process of EMR and other data, including working closely with vendors to develop technical solutions and processes for the acquisition.  By Fievitz's own admission, as set forth in his Resume attached at Exhibit D and provided to IMS for marketing purposes, his job responsibilities included:

        a.      Key contributor to conceptual design and development of several innovative products with annual revenue reaching $4.5 MM in 2 years;

        b.      Leading team of business consultants, clinicians and database developers to perform data assessment, analytics, and clinical validation of EMR/HER/Registry ambulatory and hospital data sources

        c.      Developing recommendations for data vendors to improve their EMR user interfaces, data content and data collection processes.  Assisting data vendors to design "meaningful use" compliant EMR software.

        d.      Responsible for all phases of EMR/HER/Registry/Survey data assessment and integration into enterprise-wide Oracle-based Data Warehouses as well as into client specific Data Marts.[1]

       26.     Schlesinger was hired by IMS on or about December 2000.  Throughout his employment at IMS, Schlesinger has worked in positions in which he has been entrusted with its confidential information and trade secrets.  In the course of his performance of his job duties for IMS, Schlesinger has been exposed to many of the Company's most important trade secrets and confidential information, particularly with respect to data architecture and analysis.  Schlesinger currently holds the position of Senior Manager, Business Analysis in IMS's Global Technology Services & Operations Department.  Schlesinger's job duties included taking a lead role in the acquisition process of EMR and other data, including working closely with vendors to develop technical solutions and processes for the acquisition.  By Schlesinger's own admission, as set forth in his Resume attached at Exhibit E and provided to IMS for marketing purposes, his job responsibilities included:

        a.      Lead manager of De-identification software rollout, overseeing dozens of installs the past year;

        b.      Created and managed business relationships with several technical providers, in the areas of data conversion, application development, sample data generation, process support and QA.  Well versed with assessing technical providers (NDA/ SOW / SLA / pricing / contracting process);

---

[1]    "Data Marts" are customized databases designed in response to an IMS's customer's request.

    c.     Client relation manager and main point-of-contact for all Medical Claims data streams (6 billions of claims annually and 70 million patients.);

    d.     Managed company-wide data migration initiative for the industry EDI 4010 to 5010 conversion;

    e.     Am regularly sought out for Data Supplier meetings, as a process and technical expert, particularly around visual presentation of complex data and process flow documentation;

    f.     Manage several processes and related resources/persons across multiple internal and external organizations.

27.    Defendants were two of less than ten employees working in IMS's EMR acquisition team, which was the only team that would have full knowledge of IMS's trade secrets and confidential information with respect to EMR acquisition processes.

28.    As just one example of the type of trade secrets and confidential information Defendants have acquired during their employment at IMS, each Defendant has detailed knowledge regarding IMS's EMR processing technology and methodology. This processing technology allows for on-boarding data from a supplier, data processing and provisioning, data analytics and assessment, and data transformations. The EMR technology and methodology also includes all Quality Control processes, computer programs/executables, EMR warehouse design, layout, database loading, and database refreshing.

29.    As another example, Defendants would have detailed knowledge regarding the technology and processes used to convert data supplier data into a standardized format usable in IMS's databases. For some suppliers, this process can take time and effort

depending upon how the supplier's data is housed and the supplier's knowledge of its own data. Defendants would rely upon processes and technologies developed by IMS to transition the data from supplier to the Company.

30.     As another example, Defendants have knowledge of the de-identification techniques, software, and patient linking methodology used by IMS to process and incorporate PHI data without revealing patient confidential information.  This technology allows IMS to link a patient to his or her records without any identifying information that would violate confidentiality obligations.  This technology and process is valuable because it allows for patient data to be acquired and incorporated into IMS databases for analysis for its customers' benefit without disclosing PHI.  If the PHI could not be efficiently and effectively de-linked from a patient, the data would have limited use because of confidentiality restrictions.  IMS has invested to develop the technology used to de-link this information.  If Defendants were permitted to share this knowledge with a competitor, such as Symphony, the competitor would be able to apply the IMS-perfected technologies and process to their own data.

31.     As another example of the trade secrets and confidential information for which Defendants have acquired deep knowledge during their employment at IMS, each Defendant has detailed knowledge of core IMS data models including Pharmacy Claims, Medical Claims, Hospital Charge Data, and Electronic Medical Records.  Defendants have knowledge as to architecture of the databases for each of these categories, including the processes for acquiring and incorporating the data into a usable format.  Through their knowledge of the data contained in these types of databases and how these databases can be used for analytical purposes, Defendants also have confidential information as to the types of data analysis that are most desirable for IMS customers.  All of this information would be valuable to

an IMS competitor, like Symphony, in that it would allow competitors to piggyback on IMS's technology and processes to improve their databases.

32.     In addition, Fievitz participated in several key IMS strategic initiatives. One strategic initiative in which he participated involved re-architecting the EMR data processing cycle to fully automate and optimize each process from the data receiving point to the IMS EMR data warehouse end point.

33.     Another strategic initiative in which Fievitz participated and which is ongoing is an effort to penetrate the market in a particular foreign country with a large potential demand for IMS data and services. In connection with that initiative, Fievitz participated in several conference calls as recently as July 2013, where key team members worked with the Business Unit to discuss IMS's approach to the particular market. This is an ongoing and highly-confidential initiative, the knowledge of which would be tremendously valuable to IMS competitors, like Symphony, that upon information and belief are also looking to expand into that market.

34.     Additionally, Defendants have deep knowledge of the EMR data provisioning process. The EMR data provisioning process is the core intellectual property of IMS that allows it to compete in EMR data analysis and processing. The data provisioning logic is a collection of business rules and clinical data mappings. This logic was developed by IMS through hands-on experience with the data and working with IMS data suppliers. The automation and optimization architecture design improves the entire EMR data processing speed and life cycle period. Defendants can use their knowledge of IMS's EMR data provisioning to apply similar technologies and process for a competitor, such as Symphony, freeriding on IMS's investment.

35.     In the course of their job duties, Defendants have also learned the details of IMS's data supply agreements, which are not publicly-available, and the technical terms of the agreements with the data suppliers.  This information is confidential and valuable because the quality of the analysis provided by IMS from its databases depends upon the quality of the data that is received and how it is received.  A competitor with knowledge of IMS's data suppliers and its terms with the data suppliers would be able to freeride on IMS's investment.

36.     As another example, Defendants also have knowledge of the analytics conducted by IMS for the benefit of its customers.  Knowledge of the types of analysis run by IMS would allow a competitor to modify its analytics to mirror IMS's unique processes and analysis, thus unlawfully freeriding on IMS's investment.

37.     Through the performance of his job duties for IMS, Fievitz has gained knowledge of confidential relationships with IMS customers and the types of services provided by IMS to the customers.  This information is not publicly known, and has been developed through years of cultivation of relationships with customers and by providing customers databases and services.  Upon information and belief, Fievitz lacked relationships with any of these customers prior to his employment with IMS.  If Fievitz works for a competitor in violation of his Restrictive Covenants Agreement, he would be able to trade on the resources expended by IMS to develop these customer relationships for the benefit of IMS's competition and unlawfully freeride on IMS's investment.

38.     Because of Fievitz's and Schlesinger's access to IMS trade secrets and confidential information, Fievitz and Schlesinger have entered into Restrictive Covenant Agreements with the Company.

39.    Fievitz was required to enter into an enforceable 2004 Restrictive

Covenant Agreement as a condition of employment, which is contained at Exhibit A.  Fievitz

entered into the 2004 Restrictive Covenant Agreement on or about April 14, 2004.

40.    In consideration for the opportunity to be eligible for certain incentive

compensation, Fievitz separately entered into an enforceable Restrictive Covenant Agreement on

or about July 20, 2010.  See Ex. B.

41.    In consideration for the opportunity to be eligible for long term incentive

compensation, Schlesinger entered into an enforceable Restrictive Covenant Agreement on or

about November 13, 2006.  See Ex. C.

42.    The Restrictive Covenant Agreements prohibit Defendants, during their

employment and for one-year thereafter, from being employed or performing services for

another company that competes with the Company.  See Exs. A, B, & C at § 3.

43.    The Agreements further prohibit Defendants, during their employment

with the Company or any time thereafter, from disclosing IMS's confidential information.  See

id. at §§ 1.1, 1.2.  Defendants agreed that they "will hold in strictest confidence and will not

disclose, divulge..any of the Company's Proprietary Information…"  Id.

44.    Defendants further acknowledged that "by reason of [their] employment

by and service with the Company [they] will have access to confidential and/or proprietary

information of the Company and its subsidiaries and affiliates[.]"  Id. at § 1.2.

45.    Defendants further acknowledged that "(i) the Company's business is

highly competitive and requires substantial and continuous expenditures of time and money to

develop, market and maintain; (ii) the restrictions [] are narrow and reasonable in relation the

skills which represent Employee's principal saleable asset both to the Company and to his/her

other prospective employers; (iii) the specific but broad geographical scope of the provisions of Sections 3 and 4 is reasonable, legitimate and fair to the Employee in light of the reasonable length of the non-competition period…and the Company's present strategy and its future needs to market its services and sell its products in a large geographic area in order to have a sufficient customer base to make the Company's business profitable…and (iv) any violation [] will result in irreparable injury to the Company." Id. at § 5.1.

46.    Defendants' Restrictive Covenant Agreements are reasonable in their temporal and geographic scope.

## C.    Defendants' Resign Their Employment and Refuse to Disclose Their New Employer or Affirm Their Commitment to Abide By Their Agreements

47.    On August 5, 2013, Fievitz and Schlesinger resigned their employment with IMS, effective August 16, 2013.

48.    When IMS management directly asked them to identify their new employer, Fievitz and Schlesinger separately refused to disclose the requested information.

49.    When IMS management next directly asked them whether their new employer was competitive with IMS, Fievitz and Schlesinger also refused to answer the question.

50.    Defendants had no legitimate purpose to refuse to answer IMS's questions regarding their future employment, particularly in light of their obligations under the Restrictive Covenant Agreements and IMS's legitimate interest in protecting its trade secrets and confidential information.

51.    Upon information and belief, Defendants have accepted employment with Symphony, which is a direct competitor of IMS.  Regrettably, this is not the first time that IMS employees with access to highly confidential information and relationships have acted

deceptively in failing to disclose their plans and designs to work for Symphony in direct violation of their non-competition agreements. In fact, when Defendants' former manager announced his resignation to IMS, he similarly refused to identify his subsequent employer but affirmatively represented that he was not going to a competitor and, as a result, IMS did not learn that he had accepted employment at Symphony until several months after he started work for Symphony. It thus appears that Symphony is hiring IMS employees and instructing or encouraging them not to disclose to IMS that Symphony has hired them, undoubtedly because it plans to use these hires in ways that require contravention of the employees' contractual obligations to IMS.

52.     In order to protect its trade secrets and confidential information and in light of Defendants' refusal to identify their subsequent employer or even inform IMS if it competed with the Company, IMS took immediate steps to eliminate Defendants' access to such information during their remaining time of employment. Specifically, IMS cut off Defendants' access to its network and facility so that they no longer could review Company trade secrets and confidential information.

53.     On August 6, 2013, IMS further reminded Defendants in writing of their common law and contractual obligations to the Company under their Restrictive Service Agreements and provided them with copies of their Agreements. Copies of the August 6, 2013 Letters to Defendants are attached at Exs. F & G.

54.     IMS has continued to employ and compensate Defendants through August 16, 2013, and has assigned them certain transition-based job duties that do not require access to its trade secrets or confidential information.

55.     On August 15, 2013, IMS informed Defendants telephonically and via e-mail of its intent to initiate this instant action in this Court on August 16, 2013.  Attached as Exhibits H and I are copies of the e-mails to Defendants.

56.     Symphony or any other competitor would receive a tremendous unfair competitive advantage if it employed Defendants during the period of their non-competition obligation.  Symphony or a competitor would learn IMS's data acquisition and architecture technologies and processes, without investing the money, time commitment, or physical materials that IMS invested in creating the process.  By way of example, if Symphony or a competitor assigned Defendants the task of fixing a problem in connected with the de-identification of PHI, Defendants would necessarily, if not inevitably, rely upon the confidential information and trade secrets they learned at IMS regarding technology and process, and, just as importantly, what fixes do not work in performing this duty on behalf of a company other than IMS.  Defendants cannot forget this knowledge or be expected not to rely on this knowledge in the course of performing their duties for Symphony or any other competitor, and, indeed, their new employer has a reasonable expectation that Defendants would provide it with a solution to a problem as cost-effectively as possible, even if Defendants' sole knowledge of that solution is due to their exposure to IMS's trade secrets and confidential information.

57.     IMS would be irreparably harmed if Defendants were permitted to violate their Restrictive Covenant Agreements and provide comparable services to Symphony or any other competitor.  IMS's trade secrets regarding its data acquisition technology and processes would be disclosed and/or used, likely inevitably, by a direct competitor who would be free-riding on IMS's investment.  The very purpose of the Restrictive Covenants Agreement is to ensure that Defendants would not present such a risk of harm to IMS.

58.     IMS must be afforded the benefit of the non-competition period so that Defendants' memory can fade, information can grow stale over time, and IMS can take the requisite measures to protect itself and to identify a replacement for Defendants and to provide that replacement with at least some of the training IMS provided to Defendants.  Otherwise, Defendants' new employer would be able to unfairly capitalize on their knowledge of IMS's confidential information and trade secrets.

59.     Defendants' effort to circumvent their obligations to IMS by refusing to identify their new employer or even acknowledge whether the employer competes with Defendants clearly demonstrates that Defendants are likely to compete with IMS and disregard their contractual and common law obligations to IMS.

60.     Although IMS cannot calculate the value of the harm caused by Defendants' contravention of their Restrictive Covenants Agreements and employment by a competitor, it is clearly in excess of $75,000.00 given the value of the other trade secrets and confidential agreement that Defendants' can now use for a competitor's benefit.

## COUNT I

## <u>BREACH OF RESTRICTIVE COVENANT AGREEMENT</u>

### (As to Defendants)

61.     Paragraphs 1 through 60 are incorporated by reference as if set forth fully therein.

62.     Defendants continue to be bound by their respective Restrictive Covenant Agreements, which is an enforceable contract between them and IMS.

63.     Defendants' Restrictive Covenant Agreements prohibit them from working for a competitor of IMS.

64.     Symphony is a direct competitor of IMS that provides analytical and report services to pharmaceutical marketing and sales organizations.

65.     Upon information and belief, Defendants' have accepted employment with Symphony and their job duties for Symphony are similar to the job duties they performed while employed by IMS.

66.     Upon information and belief, Defendants have repudiated Section 8.4 of their respective Restrictive Covenant Agreements and has thus breached their Agreements by accepting employment with IMS's direct competitor, Symphony.

67.     Defendants' breach of their respective Restrictive Covenant Agreements threatens immediate and irreparable harm to IMS.

68.     IMS has no adequate remedy at law, and will continue to suffer substantial and immediate irreparable harm unless Defendants are enjoined as requested below.

69.     Greater injury will be inflicted on IMS by the denial of the relief requested herein than will be inflicted on Defendants by the granting of this relief.

## COUNT II

### MISAPPROPRIATION OF TRADE SECRETS – 12 Pa.C.S.A. § 5302

**(as to Defendants)**

70.     Paragraphs 1 through 69 are incorporated by reference as if fully set forth herein.

71.     Upon information and belief, Defendants will, inevitably or intentionally, disclose to Symphony, or use on behalf of Symphony and for Symphony' exclusive benefit, confidential information and trade secrets of IMS without the express or implied consent of IMS.

72.     By virtue of Defendants' misappropriation of IMS's trade secrets for the benefit of Symphony, IMS is threatened with immediate and irreparable harm.

73.     Defendants' conduct has been willful and outrageous and undertaken with reckless indifference to the rights of IMS.

74.     Greater injury will be inflicted upon IMS by the denial of the relief requested herein than will be inflicted on Defendants by the granting of such relief.

## PRAYER FOR RELIEF

WHEREFORE, IMS requests the following relief:

(a)     Defendants be enjoined, preliminarily until hearing, and thereafter indefinitely, from accepting employment or otherwise performing services for Symphony or any other competitor of IMS.

(b)     Defendants be enjoined, preliminarily until hearing, and thereafter indefinitely, from using or presenting any of IMS's trade secrets or proprietary and confidential information, or to any other party other than IMS.

(c)     Defendants be directed to immediately return to IMS all Company documents and information, with the exception of documents and information pertaining to Defendants' personal compensation.

(d)     Defendants be ordered to promptly produce copies of all such Company documents during the expedited discovery process related to Plaintiff's Motion for Temporary Restraining Order and Motion for Preliminary Injunction and Other Relief.

(e)     Defendants be directed to pay actual damages, compensatory damages, punitive damages, pre-judgment interest, and post-judgment interest.

(f)     Defendants be directed to pay the costs of these proceedings.


(g)     This Court order such other and further relief, including attorneys' fees

and costs, as it deems appropriate.


Dated: August 16, 2013                          Respectfully Submitted,

                                                _____
                                                Michael L. Banks
                                                Sarah E. Bouchard
                                                Jonathan S. Krause
                                                MORGAN, LEWIS & BOCKIUS LLP
                                                1701 Market Street
                                                Philadelphia, PA 19103
                                                215-963-5387/5077/5510
                                                mbanks@morganlewis.com
                                                sbouchard@morganlewis.com
                                                jkrause@morganlewis.com


                                                Attorneys for Plaintiff
                                                IMS Health Incorporated